# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| WILLIAM COX, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
|       v. | ) |
| | ) |
| MASSACHUSETTS DEPARTMENT OF | ) |
| CORRECTION, | ) |
| | ) |
|       Defendant. | ) |

**Civil Action No.
13-10379-FDS**

_____

## MEMORANDUM AND ORDER ON
## <u>DEFENDANT'S POST-TRIAL MOTIONS</u>

**SAYLOR, J.**

This is an action brought by a mentally-disabled state prisoner asserting claims under the

Americans with Disability Act, 42 U.S.C. § 12101 *et seq.*  Plaintiff William Cox contends that he

was the victim of discrimination on the basis of disability because he was denied adequate access

to (1) procedures to obtain medical care, (2) procedures to report and resolve grievances, (3)

procedures to report physical or sexual assaults, and (4) use of telephones.  After a trial, a jury

found in his favor on those claims and awarded him money damages.[1]  Defendant Massachusetts

Department of Correction has moved for judgment in its favor as a matter of law under Fed. R.

Civ. P. 50 and for remittitur or (in the alternative) for a new trial under Fed. R. Civ. P. 59(e) and

(a).

The basic question before the Court is whether the verdict should be overturned, in whole

---

[1] Cox has sought both money damages and injunctive relief in this proceeding; this memorandum and order resolves only the issue of money damages, leaving open the issue of injunctive relief.

or in part, on grounds of lack of evidence or sovereign immunity.  The issue, of course, is not whether Cox is an unsympathetic figure (he is a convicted murderer serving a life sentence) or a sympathetic figure (he is a mentally disabled man who was sexually assaulted in prison).  Nor is the issue whether the procedures at issue are ideal in all respects.  Rather, it is whether—under the complex procedural interplay between the ADA, principles of sovereign immunity, and the Constitution—the award of money damages should be upheld.  For the reasons set forth below, the motions will be granted in part and denied in part.

## I.    Background

William Cox is a 57-year-old inmate currently serving a life sentence in Massachusetts state prison for a conviction of second-degree murder in 2007.[2]  He is mentally disabled and has an intelligence quotient ("IQ") of 51.  (Tr. 3:65).  He is unable to read, write, and dial a telephone without assistance.  (Tr. 2:45-46; 3:68, 92).  Since 2009, he has been housed in the residential-treatment unit ("RTU"), a specialized unit for inmates with mental-health problems.  (Tr. 3:23, 37).

At trial, Cox presented evidence concerning his inability to access various prison programs and services.  He presented evidence that, due to his inability to write, he was unable to fill out sick-call slips to request medical attention.  (Tr. 2:47).  There was evidence that he sometimes experienced delays in receiving medical care, although the length of the delays and their cause is unclear.  He testified that other inmates help him fill out sick-call slips, and that, in exchange, he is often required to barter with them, generally by giving them items he has purchased through the prison commissary system, such as chips, coffee, or pastries.  (Tr. 5:127-28).  Because he is required to barter for favors, he believes that he is more vulnerable to

---

[2] The jury in this matter was not advised of the nature of the crime for which Cox had been sentenced.

exploitation by other prisoners.

Cox also presented evidence that his inability to write prevented him from making full use of the prison grievance system, and that, as with sick-call slips, he had to give other inmates items from his commissary in exchange for their help writing out grievance forms. (Tr. 5:128).

Cox also presented evidence concerning his inability to dial the telephone. Again, he testified that he sometimes gave other inmates items from his commissary in exchange for their help dialing the telephone. (Tr. 5:127-28).

His inability to dial the telephone also restricted his ability to use the confidential hotline to report instances of sexual assault, referred to as the "PREA" hotline in reference to the Prison Rape Elimination Act, 34 U.S.C. § 30301 *et seq*. (Tr. 2:59-60, 92). There was testimony at trial that he was the victim of a sexual assault committed by other inmates, in which other inmates inserted a deodorant bottle in his anus. (Tr. 2:55-57). There was also testimony that another inmate who witnessed the incident called the PREA hotline on Cox's behalf to report it. (Tr. 5:114; 2:88).

Prior to that incident, the same inmates who sexually assaulted Cox at least twice pulled his pants down and made fun of the size of his penis. (Tr. 2:61-63; 5:111, 122). Cox testified that he reported the incidents to corrections officers, but that they told him that it was his fault and "never done nothing about it." (Tr. 5:111, 122).

An inmate named George Stallings testified that he occasionally helped Cox make phone calls or write letters. (Tr. 2:63). Stallings testified in general terms that when Cox asked corrections officers for assistance, they would refuse to help, and instead "laugh, clown at him," and say things like "'look at this clown' or 'look at this guy, is he serious?'" (Tr. 2:64).

The DOC presented testimony that placement in the RTU meant that Cox had access to

the "very highest level of general population care [available] in the Department of Correction." (Tr. 3:131). There was testimony that the mental-health clinicians who staffed the RTU were available to help inmates with things such as reading or writing letters or forms and dialing the telephone. (Tr. 3:56-57, 93; 6:97). There was also testimony that Cox had daily access to nurses and mental-health clinicians, from whom he could seek assistance at any time. (Tr. 6:94, 113, 3:54).

The jury returned a verdict in favor of Cox and against the DOC on most of his ADA claims, finding that he lacked meaningful access to (1) procedures to obtain medical care; (2) procedures to report and resolve grievances; (3) procedures to report physical or sexual threats or assaults; and (4) use of telephones. (Docket No. 199 at 1-2).[3] The jury awarded damages in the amount of $250,000, broken down between the different claims as follows: $50,000 for lack of access to procedures to obtain medical care; $25,000 for lack of access to procedures to report and resolve grievances; $150,000 for lack of access to procedures to report physical and sexual threats or assaults; and $25,000 for lack of access to telephones. (*Id.* at 3).

The DOC has moved for post-trial relief in the form of judgment as a matter of law, sovereign immunity as to the damages award, and remittitur or, in the alternative, a new trial on damages.

## II.      Analysis

### A.      Judgment as a Matter of Law

The DOC has moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b). It contends that judgment in its favor is warranted because (1) the evidence presented at trial

---

[3] The jury found in favor of Steven J. O'Brien, the Superintendent of the Massachusetts Department of Correction, who had been sued in his official capacity. It also found for defendants on a claim that Cox's disability prevented him from having meaningful access to the shower.

showed that Cox had meaningful access to prison programs and services and (2) the evidence did not support a finding of intentional discrimination, as is required to award compensatory damages under the ADA. It has further moved for judgment as a matter of law on the ground of sovereign immunity.

### 1.     Whether the Claims Are Preserved

A Rule 50(b) motion for judgment as a matter of law is "bounded by the movant's earlier Rule 50(a) motion." *Parker v. Gerrish*, 547 F.3d 1, 12 (1st Cir. 2008) (internal quotation marks omitted). Such a motion cannot be used to "introduce a legal theory not distinctly articulated in [the movant's] close-of-evidence motion for a directed verdict." *Id.* (internal quotation marks omitted); *accord Costa-Urena v. Segarra*, 590 F.3d 18, 26 n.4 (1st Cir. 2009) ("It is well-established that arguments not made in a motion for judgment as a matter of law under Rule 50(a) cannot then be advanced in a renewed motion for judgment as a matter of law under Rule 50(b)."); Fed. R. Civ. P. 50 Advisory Committee's Notes, 2006 Amendments ("Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion.").

Defendants filed two pre-verdict Rule 50(a) motions, one at the close of Cox's case and the other at the close of all the evidence. Those motions focused primarily on the claim against defendant O'Brien in his individual capacity. (*See* Docket No. 194 at 1-8; Docket No. 195 at 1-8). As to the ADA claim against the DOC, the motions focused primarily on the issue of sovereign immunity. (*See* Docket No. 194 at 8-10; Docket No. 195 at 8-10).

As part of its argument on sovereign immunity, the DOC contended that "the plaintiff has failed to produce evidence to prove each element" of his ADA claim. (Docket No. 194 at 8; Docket No. 195 at 8). It went on to state:

> [Cox] has failed to produce evidence that the Department of Correction denied [him] access to prison services with a discriminatory purpose, a required element of his claim. [He] has failed to show that there was anything different about the way he was treated "by reason of . . . disability." [He] has failed to show that his disability was a substantial cause of the exclusion or denial of any reasonable accommodation. In order for his claim to survive, [he] must allege causation between the alleged discrimination and his disability. [He] has failed to show that the defendant violated Title II with respect to any of the alleged services he was denied—assistance using [the] telephone, assistance filing grievances, assistance writing sick slips, and assistance cleaning his cell or using the shower.

(Docket No. 194 at 8-9; Docket No. 195 at 8-9) (internal citations omitted). At oral argument on the motion, defendants presented argument on the claims against O'Brien and the issue of sovereign immunity only. (*See* Tr. 6:19-24). As to sovereign immunity, the DOC argued that Cox had failed to show "any injury to . . . even with respect to any lost opportunity" to access prison programs and services and that "Cox has failed to show any injury with respect to the specific claims under the ADA with respect to medical care, the grievance procedures, telephone, [and] showers." (*Id.* at 21, 24). In context, however, it is unclear whether the DOC's arguments were made under the standards of the ADA itself or the standards of the constitutional provisions relevant to each claim.

Thus, there is some ambiguity as to whether the DOC directly challenged the sufficiency of the evidence to support Cox's ADA claims in its earlier Rule 50(a) motions. However, the first step in the relevant sovereign-immunity analysis is whether the plaintiff has stated a viable ADA claim. *See United States v. Georgia*, 546 U.S. 151, 159 (2006). Accordingly, its Rule 50(b) motion does not introduce a wholly new legal theory or argument. The Court will therefore proceed to the merits of the motion.

### 2. Whether Judgment as a Matter of Law Is Appropriate

A motion for judgment as a matter of law may be granted only "when, after examining the evidence of record and drawing all inferences in favor of the nonmoving party, the record

reveals no sufficient evidentiary basis for the verdict." *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 75 (1st Cir. 2001). When considering a motion for judgment as a matter of law, "the court may not weigh the evidence, undertake credibility determinations, or engage in differential factfinding." *Id.* Rather, "the jury's verdict must stand unless the evidence, taken in the light most favorable to the prevailing party, points unerringly to an opposite conclusion." *Id.*

To succeed on a claim under Title II of the ADA, a plaintiff must establish "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000). The second prong generally requires that a plaintiff show that he was denied "'meaningful access' to government benefits and programs," meaning that the defendant failed to take "reasonable steps to ensure that [the plaintiff] can take advantage of" its benefits and programs. *Theriault v. Flynn*, 162 F.3d 46, 48 (1st Cir. 1998).

Here, it is undisputed that due to his intellectual disabilities, Cox is unable to read, write, or dial a telephone. The DOC contends that the evidence presented at trial failed to establish that those limitations prevented him from accessing the prison programs and services at issue.

For the reasons set forth below, the evidence here is sufficient, if sometimes marginally so, to establish that Cox was denied access to (1) procedures to obtain medical care, (2) procedures to report and resolve grievances, and (3) procedures to report physical and sexual assault. It is not sufficient, however, to establish that he was denied meaningful access to the use of telephones, and for that reason, the motion for judgment as a matter of law will be granted as to that claim.

a. **Evidence of Denial of Access to Programs and Services**

(1) **Procedures to Obtain Medical Care**

The DOC contends that the evidence presented at trial did not establish that Cox was denied meaningful access to procedures to obtain medical care. In particular, it contends that the evidence showed that he does not need to write a sick slip in order to receive medical care, but could simply ask any member of the staff, including his mental-health clinicians or the nurses that he sees daily to receive insulin injections, that he needs to see medical staff.

At trial, Karen Dinardo, the deputy superintendent of re-entry at North Central Correctional Institute-Gardner and the ADA coordinator, testified that Cox could access medical care by "ask[ing] staff, let[ting] staff know that he is in need of service," or asking a nurse in the insulin line who "would make sure that he was seen by somebody if he was experiencing any difficulty." (Tr. 6:113). Andrea Mitchell, Cox's mental-health clinician, also testified that she sees him on a daily basis and would "[a]bsolutely" assist him with writing a sick-call slip if he asked. (Tr. 6:94). Mitzi Peterson, the director of behavioral health for the DOC, testified that an inmate could approach staff on the unit doing rounds to verbally ask for medical assistance. (Tr. 3:54). Cox himself also testified that his mental-health clinicians "help[] me any time I ask" and that he can "go down to medical, they help me, too. I go down to medical and ask the people who runs [sic] it." (Tr. 5:138).

However, another inmate, George Stallings, testified that an inmate could "[a]bsolutely not" just show up at the medical unit and receive treatment. (Tr. 2:47). Cox testified that sometimes medical staff or mental health staff told him they were too busy to help him, and would tell him to go back to his unit. (Tr. 5:132-33).[4] There was also evidence from which the

---

[4] He also testified that corrections officers would sometimes tell him to "go back to his room" when he asked them for help. (Tr. 5:133).

jury might have reasonably inferred that when Cox asked for medical attention, he was told that he needed to fill out a sick-call slip in order to be seen. (Trial Ex. 1.1563 (sick-call slip, apparently filled out by another inmate, stating "I want to know why I haven't seen a doctor? As told by Carol (nurse H.S.U). Please help. Thank you."); Trial Ex. 1.1849 (sick-call slip, apparently filled out by another inmate, stating "At approx. 9 AM during med. line I informed nurse Tracy of bowl bleading [sic] when I poop. When I wipe the blood pours from me.")). The sick call request forms in evidence contain a number of complaints from Cox about delays. (*See, e.g.,* Exs. 1.1563, 1.1742, 1.2111, 1.2112). Cox testified that when other inmates helped him fill out a sick slip, he would give them "my pastry, like cupcake, anything." (Tr. 5:128).

As noted, Stallings testified that as a general matter, corrections officers would make fun of Cox if he asked for assistance. (Tr. 2:64). Stallings did not specifically testify, however, that corrections officers refused to assist Cox in filling out sick-call slips.

It is far from clear that the evidence as to the claim of denial of adequate access to medical care is sufficient to sustain the verdict. There was unrebutted evidence that Cox had daily access to medical and mental-health professionals who could (and would) assist him in obtaining any required care. Medical resources are limited, even outside of prisons, and delays in obtaining non-emergency care are commonplace; a delay by no means automatically equates to a denial, or even the provision of substandard care. The question is further complicated by the prison environment. It is reasonable for prisons to require orderly procedures for seeking medical treatment, and not simply permit prisoners to simply show up at the clinic and receive treatment on demand. The requirement of a written slip for non-emergency treatment is not unreasonable, even for a mentally disabled prisoner, as long as assistance in filling out the slip is provided.

On the other hand, prisoners are at the mercy of the staff, and they cannot seek care elsewhere if their requests are ignored. There was some evidence that corrections officers did not provide assistance in obtaining care, and instead made fun of Cox. Cox testified that (in effect) he had to pay inmates to help him fill out sick slips. And there is some evidence of delays in obtaining access to health care.

Accordingly, the Court will not overturn the verdict concerning Cox's access to procedures to request medical care because the evidence, viewed in the light most favorable to him, does not "point[] unerringly to an opposite conclusion." *Zimmerman*, 262 F.3d at 75.

### (2)     Procedures to Report and Resolve Grievances

The DOC further contends that the evidence at trial failed to establish that Cox lacked meaningful access to procedures to report and resolve grievances. It points to evidence that Cox is able to advocate for himself and has in fact "advocated for himself in interpersonal struggles with others, with issues with roommates." (Tr. 3:125 (testimony of Mitzi Peterson)). There is also evidence that, on at least one occasion, he spoke to a mental-health clinician about another inmate who "provokes" him. (Tr. 3:60).[5]

The DOC also points to evidence that Cox's mental-health clinicians are available for confidential meetings and can provide assistance with reading and writing. (Tr. 6:86-88). There was evidence that if an inmate reported to a mental-health clinician that he was afraid that someone else was going to harm him, that clinician would report that to the shift commander and file a confidential incident report for the superintendent's review. (Tr. 3:55). Finally, there was evidence that inmates can report problems to DOC staff during staff rounds or staff access hour, during which inmates can report problems or complaints to DOC officials from the

---

[5] There was no evidence presented of any steps taken to resolve the apparent conflict with that other inmate.

superintendent's administration.  (Tr. 2:67; Tr. 6:111).

However, there was also some evidence that Cox may have lacked meaningful access to grievance procedures.  For example, Prisoners' Legal Services attorney Lauren Petit testified that, to her knowledge, no DOC staff member had ever helped Cox file a grievance.  (Tr. 4:81). There was evidence from which the jury could conclude that Cox lacks the mental capacity to advocate on his own behalf and proactively seek out assistance from staff members.  (*See* Tr. 3:65-68 (discussing Cox's IQ and intellectual capabilities); Tr. 4:100 (testimony by attorney Lauren Petit that Cox is "unable to . . . understand the information that he would need to present in order to substantiate what his needs are" and that his ability to express his needs is "very limited")).  Cox testified that he "wouldn't fill out no grievance," but that if other inmates helped him, he would give them something.  (Tr. 5:128).  And as noted, there was testimony from Stallings that corrections officers were generally not responsive to Cox's requests for assistance. (*See* Tr. 2:64).

Again, it is far from clear whether the evidence on this issue is sufficient.  Because Cox is illiterate and has limited intellectual capacity, he will never be able to put grievances in writing without assistance, and will always have difficulty advocating for himself and seeking out the help of staff, regardless of what procedures are in place.  There is no evidence that he ever actually attempted to file a grievance and failed, was prevented from filing a grievance, or suffered an injury that could have been resolved by a grievance.[6]

Nonetheless, again the Court will not overturn the jury's verdict as to this issue because

---

[6] The closest the evidence comes to establishing such an injury is Cox's testimony that he had a bag of coffee and corn chips stolen by another prisoner from his cell; that he had a cassette player stolen by a different prisoner; that he told his mental-health worker about the thefts; and that the prisoner responsible for the cassette-player theft was not punished for it.  (Tr. 5:113-14).  There was no evidence, however, as to any effort by Cox to file a grievance as to those incidents, or whether or how the grievance process might have resolved the situation.

the evidence, viewed in the light most favorable to plaintiff, does not "point[] unerringly to an opposite conclusion." *Zimmerman*, 262 F.3d at 75.

(3) <u>Procedures to Report Physical and Sexual Assault</u>

The DOC next contends that the evidence at trial failed to establish that Cox was denied meaningful access to procedures to report physical and sexual assaults. It points to evidence that he was able to report any problems to DOC staff, including mental-health clinicians, corrections officers, and other officials during either staff rounds or staff access hour. It also points to evidence that he has monthly confidential meetings with his mental-health clinician, that he could request additional confidential meetings if necessary, and that if he reported any instance of physical or sexual assault to his clinician, that person would then file an incident report for the superintendent's review. (Tr. 3:55; 6:86-87). Thus, the DOC contends that his inability to dial a telephone and use the confidential PREA hotline did not prevent him from reporting assaults in other ways.

As noted, there was evidence that DOC staff were not always responsive to Cox's requests for assistance. Cox testified that he reported to corrections officers that other inmates—the same inmates who later sexually assaulted him—were pulling down his pants, laughing at him, and making fun of the size of his penis, but that the officers did nothing about it. (Tr. 5:111, 122). Again, there was also testimony from Stallings that when Cox asked corrections officers for help, they would "laugh at him" or call him a "clown." (Tr. 2:64). Furthermore, there was testimony from Stallings that the PREA hotline was necessary to provide a confidential means of reporting assault so that the individual making the report would not be labelled a "rat," which could have consequences for that prisoner's safety. (Tr. 2:91-92). Arguably, the earlier refusal of the guards to respond to the earlier incidents contributed, at least in part, to the

subsequent sexual assault of Cox.

Again, it is not at all clear that the evidence as to this issue was sufficient.  If Cox cannot use a telephone without the assistance of others, he will never be able to access the PREA hotline, and will always have to rely on oral reports to staff or the assistance of staff. Nonetheless, again the Court will not overturn the verdict, as it is not plainly against the weight of the evidence.

### (4)    Access to Telephones

Finally, the DOC contends that the evidence presented at trial does not support the jury's verdict that Cox lacked meaningful access to use of the telephone.  It points to testimony that clinical staff would be available to help him dial a telephone if he requested that help.  (Tr. 6:97). It also points to Cox's own testimony concerning his ability to ask his clinician to help him place a telephone call.  While Cox did testify that he asked his mental-health clinician to help him call his family, his testimony on the issue was ambiguous at best.  He testified that he sometimes asked a particular mental-health caseworker to call his brother or sister and he seemed to suggest that she helped him when he requested.  (Tr. 5:138).  When he was asked whether his "case workers help [him] dial the phone," he responded, "[s]he don't dial the phone, I'll ask her, she'll turn around and call in the office for me."  (Tr. 5:140).  He also testified that "sometimes" when he wants to make a phone call, he asks other inmates for help and that he will give them "a bag of coffee or a bag of chips."  (Tr. 5:127-28).

As to this issue, there is insufficient evidence to sustain the verdict.  There was no testimony that anyone on DOC staff ever refused to help him dial the phone, or that his access was impeded in any meaningful way, or that he could not make calls unless he paid other inmates.  It is true that inmate Stallings testified in general terms that corrections officers did not

assist Cox. But there is no evidence tying any such refusal, directly or indirectly, to the use of the telephone, and Cox's testimony seems to suggest the contrary. Accordingly, the verdict will be overturned as to that issue, and judgment as a matter of law will be granted as to Cox's ability to access the telephone.

**b.** **Evidence of Intentional Discrimination**

It is well-settled that "private individuals may recover compensatory damages under . . . Title II only for intentional discrimination." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 126 (1st Cir. 2003). Many circuit courts have held that the applicable standard for proving intentional discrimination is one of "deliberate indifference." *See, e.g.*, *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013); *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012); *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011); *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228-29 (10th Cir. 2009); *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008); *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 115 (2d Cir. 2001). However, the First Circuit appears to have adopted the more stringent standard of "discriminatory animus." *Nieves-Marquez*, 353 F.3d at 126-27; *Carmona-Rivera v. Puerto Rico*, 464 F.3d 14, 17-18 (1st Cir. 2006).

Proof of "deliberate indifference" "does not require a showing of personal ill will or animosity toward the disabled person." *Meagley*, 639 F.3d at 389. Rather, the test for deliberate indifference is comprised of two prongs: (1) "knowledge that a harm to a federally protected right is substantially likely," and (2) "a failure to act upon that . . . likelihood." *Barber*, 562 F.3d at 1229 (citing *Duvall*, 260 F.3d at 1139). By contrast, proof of "discriminatory animus" requires a showing that a defendant intended to discriminate against a plaintiff based on his disability. *See Liese*, 701 F.3d at 344 ("Discriminatory animus . . . requires a showing of

prejudice, spite, or ill will."); *see also Laurin v. Providence Hosp.*, 150 F.3d 52, 58 (1st Cir. 1998) (finding that direct evidence is usually needed to prove discriminatory animus); *Moebius v. Tharperobbins Co.*, 2016 WL 6476941, at *17-18 (D. Mass. Nov. 1, 2016).

The DOC contends that the evidence at trial failed to establish intentional discrimination, and that he could access all of the programs and services at issue by approaching DOC staff and asking for their assistance. Because the claims survive under either standard, the Court will assume, without deciding, that intentional discrimination under the ADA must be established under a "deliberate indifference" standard. *See Liese*, 701 F.3d 334, 345-48.

The evidence that DOC was deliberately indifferent to Cox's right to be free from disability discrimination is relatively thin. First, Cox argues that there was evidence that the DOC knew that he lacked the ability to advocate on his own behalf and that being required to approach staff for assistance was therefore a likely barrier to his ability to access the programs and services at issue.[7] But knowledge that Cox faced barriers is not the same as deliberate indifference to his ability to surmount those barriers. Because of his mental limitations, as a practical matter Cox could never access the programs and services at issue without the assistance of staff. This is not a situation where the prison could remove the barriers by building a ramp, or widening a doorway, or providing a piece of technical equipment. Indeed, Cox has put forth no evidence of reasonable alternatives under which he could have reasonable access to the programs and services at issue without staff assistance. The fact that he was required to seek assistance is therefore inadequate, standing alone, to show deliberate indifference.

Second, Cox contends that DOC staff refused to assist him when he did seek their help.

---

[7] For example, Prisoners' Legal Services attorney Lauren Petit testified that she wrote a letter to the Director of Classification, Carol Mici, stating that Cox "does not appear to have the wherewithal to appropriately represent himself or his needs." (Tr. 4:67-69).

Of course, evidence that staff was not as completely responsive as they might have been, or that they were not as proactive, is not sufficient to constitute deliberate indifference. The issue is not whether that Cox's access to the relevant programs and services was ideal; it is whether the individuals responsible for that access actually knew that his rights as a disabled person were being violated, or were likely to be violated, and failed to take the necessary steps to ensure his access to the relevant programs and services.

The principal evidence of such refusal concerns corrections officers, rather than medical or mental-health professionals. But corrections officers are DOC staff, no less than medical or mental-health professionals, and any indifference of such officers is properly attributable to the DOC. Moreover, it is not unreasonable under the circumstances to infer a causal relationship between Cox's disability and the officers' failure to assist him. That evidence is not strong, but it is evidence from which a reasonable jury could have found deliberate indifference.

Accordingly, under the circumstances, there was sufficient evidence from which the jury could have reasonably concluded that DOC corrections officers "knew that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood" as to Cox's access to procedures to obtain medical care report grievances, and report sexual or physical assault. *See Liese*, 701 F.3d at 344.[8]

## 2. <u>Sovereign Immunity</u>

The DOC also seeks entry of judgment as to the damages award on the ground of sovereign immunity.

---

[8] Defendant contends that "[i]f the Department was deliberately indifferent and purposefully trying to avoid its obligations under the ADA, Mr. Cox would likely not reside in [the RTU]." (Def. Mem. at 22). However, the fact that Cox was housed in the RTU is not enough to show a lack of deliberate indifference. In other words, if the evidence at trial, viewed in the light most favorable to Cox, supports the conclusion that the DOC knew that the RTU placement itself was likely insufficient to ensure that he had meaningful access to the programs and services at issue, then judgment as a matter of law is not warranted.

a.      **The Legal Framework**

In *United States v. Georgia*, 546 U.S. 151 (2006), the Supreme Court held that Title II of the ADA validly abrogates state sovereign immunity insofar as it "creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment." *Id.* at 159 (emphasis in original).  For claims involving conduct that does not actually violate the Fourteenth Amendment, Title II may nonetheless abrogate sovereign immunity if Congress's proscription of that "class of conduct" constitutes a valid exercise of its § 5 enforcement powers.  *See id.*; *City of Boerne v. Flores*, 521 U.S. 507 (1997); *see also Tennessee v. Lane*, 541 U.S. 509, 522-34 (2004) (applying *Boerne* to analyze abrogation of state sovereign immunity under Title II).  Under § 5, Congress may act prophylactically to deter violations of the Fourteenth Amendment "by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text."  *Lane*, 541 U.S. at 518 (internal quotation marks omitted).

The Fourteenth Amendment provides that states may not deprive persons of life, liberty, or property without due process of law.  U.S. Const. Amend. XIV.  In addition, the due-process clause of the Fourteenth Amendment has been interpreted to "incorporate" various specific constitutional rights and make them applicable to the states.  Those rights include, among others, the right to be free from cruel and unusual punishments under the Eighth Amendment and the right to petition for redress of grievances under the First Amendment.  *See Robinson v. California*, 370 U.S. 660 (1962) (Eighth Amendment); *Edwards v. South Carolina*, 372 U.S. 229 (1963) (First Amendment).

Whether legislation is a valid exercise of Congress's § 5 enforcement powers is determined under a three-pronged inquiry:  (1) first, the court must "identify with some precision

the scope of the constitutional right at issue," *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 346, 365 (2001); (2) second, the court must determine whether Congress identified a history and pattern of unconstitutional conduct by the states with respect to that right, *id.* at 368; and (3) third, the legislation must be a "congruent and proportional response to [the] history and pattern of unconstitutional discrimination," *Toledo v. Sanchez*, 454 F.3d 24, 39 (1st Cir. 2006). In the First Circuit, the analysis focuses "on the particular category of state conduct at issue," rather than on the full range of constitutional rights protected under the ADA and the concomitant wide range of state conduct potentially violating those rights. *Toledo*, 454 F.3d at 35.

Abrogation of sovereign immunity under Title II is determined on a claim-by-claim basis. *See Georgia*, 546 U.S. at 159. Thus, for each claimed ADA violation, the complained-of conduct (1) must violate Title II and (2) either (a) must violate the Fourteenth Amendment or (b) its proscription must bear congruence and proportionality to the rights protected under that Amendment. *See id.*; *Buchanan v. Maine*, 469 F.3d 158, 172-73 (1st Cir. 2006).

When an immunity defense is pressed after a jury verdict, "the evidence must be construed in the light most hospitable to the party that prevailed at trial. . . . [D]eference should be accorded to the jury's discernible resolution of disputed factual issues." *Iacobucci v. Boulter*, 193 F.3d 14, 23 (1st Cir. 1999).

In returning its verdict, the jury necessarily found that Cox was denied "meaningful access to the benefits" of the programs and services at issue; that he either requested reasonable accommodations or that his need for accommodations was obvious; and that he was denied the benefit those services "by reason of his disability." (Tr. 7:100-02). By awarding damages on those claims, the jury necessarily found that the DOC "'intentionally' discriminated against [Cox] on the basis of his disability." (Tr. 7:106-07).

### b.    Whether Sovereign Immunity Has Been Waived

Cox contends that the DOC has waived its sovereign-immunity defense through affirmative action in litigation.  Certain affirmative acts of litigation may be deemed to constitute a waiver of sovereign immunity; in particular, "where a State voluntarily becomes a party to a cause, and submits its rights for judicial determination, it will be bound thereby, and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh Amendment."  *Gunter v. Atlantic Coast Line R.R. Co.*, 200 U.S. 273, 284 (1906).  Generally, waiver is limited to cases where a state voluntarily appears in court, either by filing an action, intervening in an action, or removing an action to federal court.  *See Clark v. Barnard*, 108 U.S. 436, 447 (1883); *Lapides v. Board of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 619, 624 (2002).  Where states are involuntarily brought into court, however, waiver is generally not found unless permitting the state to assert sovereign immunity belatedly will work some unfairness.  *See N.H. v. Ramsey*, 366 F.3d 1, 18-19 (1st Cir. 2004) (declining to find waiver of sovereign immunity as to damages, despite belated raising of defense, absent any indication of unfairness); *Union Pacific R.R. Co. v. Louisiana Pub. Serv. Comm'n*, 662 F.3d 336, 341-42 (5th Cir. 2011) (permitting state to raise sovereign immunity for first time on appeal where there was no evidence of "gamesmanship").  *Cf. Calderon v. Ashmus*, 523 U.S. 740, 745 n.2 (1998) (stating that Eleventh Amendment sovereign immunity "can be raised at any stage of the proceedings").

Here, it does not appear that the DOC received any tactical advantage from waiting until the summary judgment stage to raise a sovereign-immunity defense.  *Cf. In re Bliemeister*, 296 F.3d 858, 862 (9th Cir. 2002) (expressing concern that the DOC received an "unfair advantage" from waiting to assert sovereign immunity until after "listening to a court's substantive

comments on the merits"); *Hill v. Blind Indus. & Servs. of Md.*, 179 F.3d 754, 757 (9th Cir. 1999) (noting that state can "gain an improper advantage" by waiting to raise sovereign immunity until after ruling on motion for summary judgment or pre-trial motions).  Although the DOC did not raise sovereign immunity in its motion to dismiss, that motion did not focus on the substantive merits of Cox's ADA claims; instead, it focused on issues of claim preclusion and failure to exhaust administrative remedies.  The only argument raised as to the ADA claims was the complaint's failure to allege that the DOC did not reasonably accommodate Cox's disability.  The Court's brief discussion of the ADA claims in its memorandum and order was limited to that narrow question.  (*See* Docket No. 29 at 18).  Accordingly, given the narrow nature of the DOC's motion to dismiss, there is no reason to think that it received any unfair advantage from waiting until summary judgment to raise the issue of sovereign immunity.  For that reason, the Court finds that the DOC has not waived the defense of sovereign immunity.

### c. Whether Sovereign Immunity Has Been Abrogated as to the Claims at Issue

### (1) Access to Procedures to Obtain Medical Care

As noted, the jury found that Cox lacked meaningful access to procedures to obtain medical care.  There is no constitutional right to any particular procedures to access medical care.  However, the failure to provide adequate medical care to a prisoner can constitute an Eighth Amendment violation where prison officials are deliberately indifferent to a known serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

The first question presented is whether Cox's lack of meaningful access to procedures to obtain medical care violated the Eighth Amendment.  "[T]o prove an Eighth Amendment violation, a prisoner must satisfy both of two prongs:  (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison

administrators' deliberate indifference to that need." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014). Under the first prong, a medical need is sufficiently serious if is "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.*

Here, there was evidence that Cox has suffered from a number of medical conditions while incarcerated, including pain in his back, sides, and knees; rectal bleeding; and trouble breathing. (*See* Tr. Exs. 1.1561, 1.1603, 1.1684, 1.1744). Those are serious medical needs; there is evidence that his back pain and knee pain were diagnosed as requiring treatment (*see* Tr. Exs. 1.1684, 1.1781), and even a lay person would recognize the necessity for medical attention concerning rectal bleeding or serious difficulty breathing.

However, Cox does not allege, nor does the evidence show, that he did not receive any treatment for those needs. In fact, the evidence presented at trial includes four volumes of medical records documenting the care that he received while incarcerated. (*See* Tr. Ex. 1). Rather, Cox contends that his lack of meaningful access to procedures to obtain medical care resulted in delays in treatment because on at least some occasions he had to wait to seek care until he could find someone, usually another inmate, to fill out a sick-call slip on his behalf.

"When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim. *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *see also Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990) ("The 'seriousness' of an

inmate's needs may also be determined by reference to the effect of the delay of treatment."). The exacerbation of injuries or illnesses or the suffering of needless pain due to a delay in treatment can be sufficient to establish a sufficiently serious medical need. *See Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir. 1991); *Gaudreault*, 923 F.2d at 208-09.

Here, there is some evidence suggesting that Cox may have experienced delays in treatment due to his inability to fill out a sick-call slip. For example, there are several sick-call slips, presumably filled out by other inmates, indicating that Cox had asked nurses for medical attention but was unable to receive care until after another inmate filled out the sick-call slip. A sick-call slip dated August 26, 2010, states "I want to know why I haven't seen a doctor? As told by Carol (nurse H.S.U.). Please help. Thank you." (Tr. Ex. 1.1563). Another sick-call slip dated March 10, 2008, states "I have a hard time breathing, my knees hurt and my legs are crampping [sic] up bad. Please help! I have asked every nurs [sic] for help [but] they say wait." (Tr. Ex. 1.2111-12). Furthermore, there is some evidence suggesting that the delays in treatment resulted in some amount of additional pain. For example, the March 10, 2008 sick-call slip indicates that Cox was in pain due to a lack of medication. (Tr. Ex. 1.2111-12).

"[E]ven if medical care is so inadequate as to satisfy the objective prong, the Eighth Amendment is not violated unless prison administrators also exhibit deliberate indifference to the prisoner's needs." *Kosilek*, 774 F.3d at 83. In this context, deliberate indifference "requires evidence that the failure in treatment was purposeful" or that prison officials exhibited a "wanton disregard" to the prisoner's needs, "requiring consciousness of 'impending harm, easily preventable.'" *Id.* (quoting *Watson v. Canton*, 984 F.2d 537, 540 (1st Cir. 1993)). The requisite state of mind can be manifested by a doctor's refusal to provide treatment, a doctor's choice of a less-effective treatment, or a prison guard intentionally denying or delaying access to medical

care.  *See Estelle*, 429 U.S. at 104-05 & n.10.  However, the relevant conduct "must involve more than ordinary lack of due care for the prisoner's interests of safety."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

The evidence presented at trial is not sufficient to establish that DOC employees acted with deliberate indifference to Cox's medical needs within the meaning of the Eighth Amendment.  First, there is insufficient evidence concerning the length of any delay in treatment.  For example, while the March 10 sick-call slip indicates that nurses had told Cox to wait for treatment, there is no evidence concerning when he asked the nurses for help, or how long he had to wait between asking those nurses and finding someone to assist him in writing out a sick-call slip.  Because Cox's claim is premised on the delay in his treatment, information on the length of and reason for that delay is crucial in order to determine whether the alleged deprivation caused by the delay itself is sufficiently serious to constitute an Eighth Amendment violation.  *See Smith*, 316 F.3d at 186 (noting that delay in treatment may not violate the Eighth Amendment where "the alleged lapses in treatment are minor and inconsequential").  Persons who are not incarcerated and who do not have mental disabilities often experience delays in obtaining medical care; indeed, such delays are a routine part of life.  Because Cox has failed to present sufficient evidence concerning the length of any delays in treatment or the severity of the resulting injury or harm, he has failed to establish an Eighth Amendment violation.

Furthermore, there is insufficient evidence to warrant a finding of deliberate indifference to Cox's medical needs.  While a nurse's refusal to provide treatment certainly could constitute deliberate indifference, whether it does so depends on the circumstances.  Among other things, whether a delay in treatment constitutes deliberate indifference depends upon the availability of resources, whether there is a medical reason or other justification for the delay, and whether the

person responsible for the delay was aware of the severity of the medical need at issue.  *See Perez v. Fenoglio*, 792 F.3d 768, 778 (7th Cir. 2015) ("[w]hether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing treatment"); *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (noting that "the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable").  Again, there is no evidence in the record sufficient to sustain an Eighth Amendment claim based on delays in providing treatment.

There is, accordingly, insufficient evidence to establish an Eighth Amendment violation.  However, abrogation of sovereign immunity may nonetheless be warranted if Congress's proscription of the specific conduct at issue under the ADA bears "congruence and proportionality" to constitutionally protected rights, to be determined under the three-prong test noted above.  As to the first prong of the inquiry, the precise scope of the constitutional right at issue has already been discussed:  under the Eighth Amendment, prison officials may not be deliberately indifferent to inmates' serious medical needs.  As to the second prong, in enacting the ADA, Congress recognized that "discrimination against individuals with disabilities persists in such critical areas as . . . health services."  42 U.S.C. § 12101(a)(3).  Furthermore, with respect to medical care in prisons specifically, "cases involving inadequate medical care . . . have perhaps been [the] most numerous" claims brought by disabled prisoners.  *Georgia*, 546 U.S. at 162 (Stevens, J., concurring); *cf. Toledo*, 454 F.3d at 37 (identifying court decisions as appropriate sources for determining whether constitutional violations at issue were sufficiently widespread).

The third prong requires a determination of whether requiring meaningful access to procedures to obtain medical care is "a congruent and proportional response to this history and

pattern of unconstitutional discrimination." *Toledo*, 454 F.3d at 39. It appears that it does. Under Title II of the ADA, public entities such as prisons may not deny medical treatment on the basis of disability and must ensure that individuals with disabilities have "meaningful access" to health services by taking "reasonable steps to ensure that individuals with disabilities can take advantage of" such benefits and programs. *See Theriault*, 162 F.3d at 48. While those requirements will sometimes, as here, exceed what is required under the Eighth Amendment, they are not "so out of proportion to supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532.

Thus, in the context of access to medical care, Congress's proscription of conduct under the ADA bears congruence and proportionality to the requirements of the Eighth Amendment, and abrogation of sovereign immunity is accordingly warranted as to this claim.

### (2) Procedures to Report and Resolve Grievances

Prisoners have "a First Amendment right to petition the prison for the redress of grievances." *Schofield v. Clarke*, 769 F. Supp. 2d 42, 46 (D. Mass. 2011); *accord Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000) ("An inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf."). "However, depriving prisoners of this opportunity only 'in some theoretical sense' will not establish a [constitutional violation]." *Rodgers v. Hawley*, 14 Fed. Appx. 403, at *3 (6th Cir. 2001) (quoting *Lewis v. Casey*, 518 U.S. 343, 351 (1996)). To state a First Amendment violation, "a prisoner must show [that] prison officials' conduct inflicted an 'actual injury,' i.e., that the conduct hindered his efforts to pursue a nonfrivolous [grievance]." *Id.* (citing *Lewis*, 518 U.S. at 351-53).

Here, there is no evidence from which the jury could reasonably conclude that DOC

personnel actually inflicted an injury under the First Amendment. As noted, there is no evidence that Cox actually sought to pursue a grievance and was hindered in doing so.

The question then becomes whether Congress's proscription of the specific conduct at issue under the ADA bears "congruence and proportionality" to constitutionally protected rights. As to the first prong of the test, the constitutional right at issue is the First Amendment right of a prisoner to petition for redress of grievances. As to the second prong, Congress identified a history and pattern of unconstitutional conduct by the states with respect to access to judicial and court procedures. Congress specifically found that "discrimination against individuals with disabilities persists in such critical areas as . . . institutionalization." 42 U.S.C. § 12101(a)(3). And a significant focus of prisoner litigation prior to the enactment of the ADA was claims by disabled prisoners for "interference with access to the judicial process, and procedural due process violations." *Georgia*, 546 U.S. at 162 (Stevens, J., concurring). Grievance procedures in prisons (which normally must be exhausted before litigation can be filed) are closely related to judicial procedures, and serve similar goals. Under the circumstances, the ADA—which, in this context, requires states to provide disabled prisoners "meaningful access" to grievance procedures, *see Theriault*, 162 F.3d at 48—is a congruent and proportional response to the history and pattern of discrimination.[9]

Accordingly, as to the claim for denial of access to procedures to report and resolve grievances, the Court finds that sovereign immunity has been abrogated.

---

[9] Under Title II of the ADA, "meaningful access" generally means that public entities must take "reasonable steps to ensure that [the plaintiff] can take advantage of" their benefits and programs. *Theriault*, 162 F.3d at 48. In discussing the analogous issue of prisoners' access to the courts, the Supreme Court has instructed that "'[m]eaningful access' to the courts is the touchstone." *Bounds v. Smith*, 430 U.S. 817, 823 (1977) (quoting *Ross v. Moffitt*, 417 U.S. 600, 611-12, 615 (1974)).

### (3)     Procedures to Report Physical and Sexual Assault

The jury found that Cox lacks meaningful access to procedures to report physical and sexual assaults. Cox contends that his lack of access to such procedures violated his rights under the Eighth Amendment.

Prison officials have a duty under the Eighth Amendment to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks omitted). That includes "'a duty . . . to protect prisoners from violence at the hands of other prisoners.'" *Id.* at 833 (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)) (alteration in original). Nonetheless,

> [i]t is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety. Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.
>
> The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment. To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety.

*Id.* at 834 (internal citations and quotation marks omitted). In this context, "deliberate indifference" requires that a prison "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

There is no dispute that rape and sexual assault are "objectively, sufficiently serious" to satisfy the first prong. *See Calderon-Ortiz v. LaBoy-Alvarado*, 300 F.3d 60, 64 (1st Cir. 2002). However, the DOC contends that it was not deliberately indifferent to a known risk of harm. To establish deliberate indifference, Cox must first show that the DOC knew of an unreasonable risk of harm, meaning "a strong likelihood that violence [or sexual assault] would occur." *Purvis v. Ponte*, 929 F.2d 822, 825 (1st Cir. 1991) (citation and internal quotation marks omitted).

The precise framework for this claim is unclear, both from the parties' briefing and from the case law. However, in the context of analyzing whether sovereign immunity has been abrogated, it appears that the inquiry must focus narrowly on Cox's inability to access procedures to report physical and sexual assault, rather than broadly on whether his mental disabilities made him vulnerable to assault. Accordingly, Cox must establish that DOC personnel knew that any limitations on his ability to access procedures to report physical and sexual assault created a substantial risk of serious harm and that they disregarded that risk.

Here, it is by no means clear that Cox has established an Eighth Amendment violation arising out of his inability to access procedures to report instances of physical or sexual assault. While there was evidence suggesting that DOC officials knew that he could not dial a telephone, and therefore that he could not independently call the PREA hotline, there was also evidence presented that they believed that he was capable of confidentially reporting instances of assault to his mental-health clinicians, and that any such report would trigger a larger investigation. (*See* Tr. 6:86-88; Tr: 3:54-55). There was also evidence that his mental-health clinician believed that Cox was able to advocate for himself and come to her with problems or questions. (Tr. 6:87-88).

The second requirement is that DOC officials must have known, or were deliberately indifferent to the fact, that Cox could not access such procedures and that the lack of such access

created a substantial risk of serious harm. Under the Eighth Amendment, deliberate indifference requires "an actual, subjective appreciation of risk." *Giroux v. Somerset Cnty.*, 178 F.3d 28, 32 (1st Cir. 1999). Here, there was evidence that corrections officers did nothing when Cox complained of sexual horseplay, and that he was eventually sexually assaulted by the same prisoner who had earlier harassed him. Whether that evidence is sufficient to support a finding of actual, subjective appreciation of risk is unclear.

Rather than resolve the issue, the Court will instead turn to the question whether the abrogation of sovereign immunity is valid pursuant to Congress's enforcement powers under § 5 of the Fourteenth Amendment. First, the specific right at issue is the Eighth Amendment right to have prison officials take reasonable measures to prevent known risks of serious harm. The second prong of the relevant inquiry requires consideration of whether Congress enacted the ADA in response to a history and pattern of unconstitutional conduct by the states with respect to that right. *See Garrett*, 531 U.S. at 374. There does not appear to be direct evidence that Congress considered the vulnerability of disabled prisoners to physical and sexual assault when it adopted the ADA. Nonetheless, it is clear that Congress was concerned about the treatment of disabled prisoners generally, and about the ability of prisoners to access services such as health care to promote their safety and well-being. Considering the issue as a whole, it appears that Congress intended to address unconstitutional abuses of state prisoners when enacting the ADA, that the physical and sexual abuse of prisoners is subsumed within the scope of the statute, and that therefore the second prong of the test is satisfied. Therefore, the ADA—which, in this context, requires states to provide disabled prisoners meaningful access to procedures to report physical and sexual assaults—is a congruent and proportional response to the history and pattern of discrimination.

Accordingly, as to the claim for denial of access to procedures to report physical and sexual assaults, the Court finds that sovereign immunity has been abrogated.

### (4) Equal Protection

Finally, Cox contends that the ADA violations found by the jury constitute violations of his rights under the Equal Protection Clause. Cox did not raise the equal protection issue as a basis for abrogation during the pre-trial proceedings concerning sovereign immunity. For that reason, and because it is unnecessary to reach the issue, the Court will not address the interplay between the ADA, the Equal Protection Clause, and principles of sovereign immunity.

### B. Remittitur or New Trial on Damages

The DOC has also moved for remittitur pursuant to Rule 59(e), or, in the alternative, a new trial on damages pursuant to Rule 59(a). It contends that the damages awarded are grossly excessive and unconscionable in light of the lack of evidence of (1) mitigation of damages; (2) intentional discrimination; (3) actual injury; and (4) physical injury or sexual assault. It also contends that remittitur or a new trial on damages is appropriate due to what it contends was an unfair surprise at trial concerning the time period of Cox's ADA claim.

### 1. Whether the Motion Is Premature

As a preliminary matter, it appears that any motion pursuant to Rule 59(a) or (e) may be premature. Motions for new trials pursuant to Rule 59(a) as well as motions to alter or amend a judgment must be filed within 28 days after the entry of judgment. Fed. R. Civ. P. 59(b), (e). In this case, however, no judgment has yet been entered. While motions made before the entry of judgment are not untimely and may be considered valid Rule 59 motions, they may also be "decidedly premature" under the circumstances. *See Kersey v. Dennison Mfg. Co.*, 3 F.3d 482, 485 n.7 (1st Cir. 1993). In the usual case, Rule 59 motions may be filed prior to the entry of

judgment simply because there is occasionally a delay between a court's memorandum opinion and the entry of judgment, which, pursuant to Rule 58, must be entered as a separate document. *See Smith v. Hudson*, 600 F.2d 60, 62 (6th Cir. 1979). In such cases, the judgment is effectively final even if, as a technical matter, judgment has not officially been entered.

In this case, there is not yet any final judgment. The issue of sovereign immunity, although resolved in this opinion, had not been resolved at the time of the motion, and the trial addressed only the question of damages, not equitable relief. Nonetheless, because it appears that the Court has the power to act, and because the issues have been briefed in full, the Court will resolve them now. If necessary to preserve an issue for appeal, the motion may be renewed at the time judgment is entered.

### 2. Remittitur

#### a. The Standard under Rule 59(e)

"Rule 59(e) itself does not state the grounds on which relief under the rule may be granted, and the district courts have considerable discretion in deciding whether to grant or deny a motion to alter or amend under Rule 59(e)." *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 190 (1st Cir. 2004). In exercising that discretion, courts should balance "the need for finality of judgments with the need to render a just decision." *Id.* The First Circuit has generally construed Rule 59(e) to require either "an 'intervening change' in the controlling law, a clear legal error, or newly-discovered evidence." *Soto-Padro v. Public Bldgs. Auth.*, 675 F.3d 1, 9 (1st Cir. 2012). Relief under the rule may also be available "'in cases in which a party has been unfairly made the victim of surprise.'" *Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 287 (1st Cir. 1993) (granting new trial where district court permitted testimony of undisclosed expert). "[A] party cannot use a Rule 59(e) motion to rehash arguments previously

rejected or to raise ones that 'could, and should, have been made before judgment issued.'"

*Soto-Padro*, 675 F.3d at 9 (quoting *Moran Vega v. Cruz Burgos*, 537 F.3d 14, 18 n.2 (1st Cir. 2008)). "The granting of a motion for reconsideration is an extraordinary remedy which should be used sparingly." *United States ex rel. Ge v. Takeda Pharm. Co.*, 737 F.3d 116, 127 (1st Cir. 2013).

Where a Rule 59(e) motion seeks to reduce an award of damages, a court may "order a remittitur if such an action is warranted in light of the evidence adduced at trial." *Climent-Garcia v. Autoridad de Transporte Maritimo y Las Islas Municipio*, 754 F.3d 17, 21 (1st Cir. 2014) (internal quotation marks omitted). "To warrant remittitur, however, the award must exceed 'any rational appraisal or estimate of the damages that could be based upon the evidence before it.'" *Id.* (quoting *Wortley v. Camplin*, 333 F.3d 284, 297 (1st Cir. 2003)). Remittitur is only appropriate where the award of damages "is so grossly disproportionate to any injury established by the evidence as to be unconscionable as a matter of law." *Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 34 (1st Cir. 1999); *see Franceschi v. Hospital Gen. San Carlos, Inc.*, 420 F.3d 1, 5 (1st Cir. 2005).

### b.    Whether the Award Was Excessive in Light of the Evidence

The DOC first contends that the damage award was "grossly excessive and exceed[ed] any rational appraisal of the damages based on the evidence presented to the jury." (Def. Mem. at 24). In particular, it contends that the award was excessive in light of the lack of evidence concerning (1) intentional discrimination; (2) mitigation of damages; (3) physical or sexual injury; and (4) actual injury.

### (1)    Intentional Discrimination

The DOC first contends that remittitur is appropriate because Cox failed to produce

evidence of intentional discrimination. However, as already discussed, there was evidence from which the jury could reasonably conclude that corrections officers acted with deliberate indifference with regard to his ability to access medical services, procedures to report grievances, and procedures to report physical or sexual abuse. Accordingly, the award of damages is not excessive as a matter of law on that basis.

### (2) <u>Mitigation</u>

The DOC next contends that remittitur is appropriate in light of "plaintiff's obligation to mitigate." (Def. Mem. at 24). The crux of this argument appears to be that Cox could have mitigated his damages by asking DOC staff and other inmates for help accessing the various programs and services at issue. (*See* Def. Mem. at 24 ("[I]t is clear that plaintiff understands how to function within the prison—both by asking staff for help and inmates for help.")). There was, in fact, evidence at the trial that he did ask other inmates and DOC staff for assistance. (*See, e.g.,* Tr. 5:138 (testimony from Cox that mental-health clinicians "helps [sic] me anytime I ask); Tr. 2:46 (testimony of inmate Stallings that he "helped [Cox] with the phone, I helped him if he needed things"); Ex. 1.2128 (sick-call slip filled out by another inmate "of Mr. Cox's request")).

There was evidence, however, from which the jury could reasonably have concluded that Cox's access to the programs and services at issue was not always "meaningful"—because, for example, he was required to barter with other inmates in exchange for their assistance. (*See* Tr. 5:128-29). *Cf. Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (holding that "limited participation" does not equal "meaningful access" under the ADA). Accordingly, the jury could reasonably have concluded that Cox did attempt to mitigate his damages but was, nonetheless, denied meaningful access the programs and services at issue. His alleged failure to mitigate,

therefore, does not warrant remittitur.

### (3)    **Physical or Sexual Injury**

Next, the DOC contends that remittitur is appropriate because the evidence failed to establish that Cox had suffered either a "physical injury or sexual assault" in connection with each alleged ADA violation.  According to the DOC, such an injury or assault is required under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, in order to bring a claim for "mental or emotional injury."

The PLRA provides that "[n]o federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act."  42 U.S.C. § 1997e(e).  The DOC appears to contend, in substance, that any deprivation of rights under the ADA, absent physical harm or sexual assault, is a "mental or emotional injury."  Cox contends that the denial of access to prison programs and services is a distinct injury under the ADA that is separate from any claim of mental or emotional injury.

Circuits are split regarding the scope of the PLRA's bar, and the First Circuit has not yet addressed the issue of whether it extends to claims for the deprivation of rights (either constitutional or statutory) absent physical injury or sexual assault.  A number of courts have held that § 1997e(e) precludes recovery for any claim that does not involve physical injury or sexual assault.  *See, e.g., Brooks v. Warden*, 800 F.3d 1295, 1298 (11th Cir. 2015).  Other courts, however, have held that the violation of constitutional or statutory rights are a "type of intangible harm wholly apart from mental or emotional injury."  *Aref v. Lynch*, 833 F.3d 242, 263 (D.C. Cir. 2016); *see also id.* at 265 (holding that plaintiffs can recover compensatory damages for injuries, like constitutional violations, that are neither mental nor emotional); *King v. Zamiara*,

788 F.3d 207, 213 (6th Cir. 2015) (same).  As the D.C. Circuit reasoned in *Aref*, the latter

approach appears to be the better reading of the statute, as the phrase "mental and emotional

injury" would otherwise be superfluous.  *See* 833 F.3d at 263 ("Had Congress intended to graft a

physical-injury requirement onto every single claim, the statute could simply have provided:

'No Federal civil action may be brought by a prisoner . . . for *any* injury suffered while in

custody without a prior showing of physical injury.'" (emphasis in original)).

      The Court concludes, in accordance with the reasoning of *Aref*, that a prisoner's

inability to access prison programs and services is itself an injury, separate and distinct from a

mental and emotional injury, for which the prisoner can recover compensatory damages absent

any showing of physical injury or sexual assault.  *See Cassidy v. Ind. Dep't of Corr.*, 199 F.3d

374, 375-77 (7th Cir. 2000) (dismissing, pursuant to § 1997e(e), prisoner's claim for damages

under ADA based on mental and emotional harm but permitting claim for damages based on,

among other things "the loss of access to programs, services, and activities").  Accordingly, §

1997e(e) does not preclude Cox from recovering damages based on his inability to access prison

programs and services.[10]

_____

[10] That conclusion is not contrary to the holding in *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299 (1986).  There, the Supreme Court held that compensatory damages for constitutional violations should be based on "compensation for provable injury" and not a "jury's subjective perception of the importance of constitutional rights as an abstract matter."  *Id.* at 308.  It stated that "nominal damages, and not damages based on some undefinable 'value' of infringed rights, are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury."  *Id.* at 308 n.11.

Here, while the inability to access certain prison programs and services may be an intangible harm, it is not abstract in the same way as the rights at issue in *Stachura*.  *Carey v. Piphus*, 435 U.S. 247 (1978), on which *Stachura* primarily relied, illustrates the distinction.  In *Carey*, two students challenged their suspensions from school on procedural due-process grounds.  The Seventh Circuit held that that the students were "entitled to recover substantial nonpunitive damages even if their suspensions were justified, and even if they [did] not prove that any other actual injury was caused by the denial of procedural due process."  *Id.* at 248.  The Supreme Court reversed, holding that injury from procedural deficiencies could not be presumed and that damages were only warranted if plaintiffs could prove that an injury occurred.  *Id.* at 263-64.  The issue in *Carey*, a constitutional violation without any discernible injury, is analogous to the ADA violations in *Gregory* and *Long*.  There, the ADA violations were abstract because the plaintiffs had failed to allege that they had either attempted to use the facilities at issue or were likely to attempt to use them in the near future.  In this case, by contrast, there was evidence at trial from which the

### (4)    **Actual Injury**

The DOC finally contends that remittitur is appropriate because, aside from the sexual assault on Cox, there was no evidence of any actual injury. It relies on *Gregory v. Otac, Inc.*, 247 F. Supp. 2d 764 (D. Md. 2003), for the proposition that "[t]he mere violation of the ADA does not alone establish injury. *Id.* at 769. "A plaintiff is obligated to show, by competent evidence, that a defendant's violation of the ADA caused him actual injury before such plaintiff can recover." *Id.* at 769-70 (citing *Long v. Coast Resorts, Inc.*, 32 F. Supp. 2d 1203, 1210 (D. Nev. 1998)).

*Gregory* and *Long* dealt with issues of standing (in cases where the plaintiffs had not alleged either that they had attempted to use the allegedly inaccessible facilities or that they were likely to attempt to use those facilities in the future). Here, by contrast, there was evidence from which the jury could reasonably conclude that Cox did in fact attempt to access at least some of the programs and services at issue, but was unable to obtain meaningful access by reason of his disability. Thus, in this case, as "[i]n most instances, the injury alleged pursuant to Title II of the ADA is exclusion from participation in, or the denial of the benefits of the services, programs, or activities of a public entity, because of discrimination against a person by reason of disability." *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 7 (1st Cir. 2000).

That does not, however, end the inquiry. Whether Cox suffered a compensable injury under the ADA does not mean that the amount of the jury award is not grossly disproportionate to the point of unconscionability, and therefore a proper subject of remittitur.

The largest component of the jury award, $150,000, was for damages for lack of access to procedures to report physical and sexual abuse. As noted, Cox was sexually assaulted by certain

---

jury could reasonably have concluded that Cox tried to access at least some of the programs and services at issue but was unable to obtain meaningful access. His injury, while intangible, was therefore not abstract.

of his fellow inmates.  This lawsuit is not a suit against the perpetrators, or against the guards who were on duty at the time and failed to prevent it; rather, it is a claim for disability discrimination.  Nonetheless, viewed in the light most favorable to the plaintiff, the jury could have concluded (1) that Cox had been abused at least twice before, when his pants had been pulled down; (2) that he complained to the corrections officers, who did nothing; (3) that he was unable to access the PREA phone to report the incidents; and (4) that the same inmates later sexually assaulted him.  From that sequence, the jury could have reasonably concluded that Cox's inability to access reporting procedures contributed, at least in part, to a subsequent physical or sexual injury.  Accordingly, the award cannot be said to be excessive, and the Court will allow it to stand.

The jury also awarded Cox $50,000 as damages for his lack of access to procedures to obtain medical care.  Any injury suffered by Cox is not due to any failure to provide medical treatment, as there was no evidence to support such an award.  Instead, the award is necessarily to compensate him for delays incurred in obtaining treatment.  As noted above, there is little evidence as to the length of any delay or the reasons for the delay; again, the provision of non-emergency medical services routinely involves delays, even for non-prisoners.  Nonetheless, when viewing the evidence as a whole, the amount of damages under the circumstances is not so grossly excessive as to require remittitur.

Finally, the jury awarded damages of $25,000 for lack of access to procedures to report and resolve grievances.  As noted, there is no evidence of any actual or specific grievance that Cox was unable to report or resolve, or that he was impaired in reporting, because he was denied meaningful access to such procedures.  While Cox has suffered an "injury" under the ADA as to that issue, it is not an injury that will support an award of compensatory damages.  In other

words, such an injury may be sufficient to support a claim for equitable relief, or nominal damages, but not a substantial damages award. Under the circumstances, any award of more than nominal damages is grossly disproportionate to the harm he suffered.

That raises the issue of what the damages award ought to be. Nominal damages are often awarded in amounts such as a single dollar; here, it appears that the highest award that could reasonably be considered nominal damages, at least under these circumstances, is $1,000. Accordingly, the Court will condition its denial of a new trial as to the issues of lack of access to grievance procedures on acceptance by the plaintiff of remittitur in the amount of $1,000.

<strong>c.      Whether the Award Was the Result of Unfair Surprise</strong>

The DOC also seeks a new trial on the ground that it was unfairly surprised by the Court's instruction that Cox's ADA claim went back to 2007. It contends that prior to and during the trial, the Court had indicated that the ADA claim was limited to the years 2010 through the present, and that any claims based on conduct that occurred between 2007 and 2010 would be barred by the ADA's three-year limitations period.

At trial, Cox sought to admit into evidence a classification report from 2007 in connection with the cross-examination of the Director of Behavioral Health for the DOC. The DOC objected to the admission of the report. The Court excluded the report, and related evidence, because Cox had not asserted a claim for improper classification. (Tr. 3:76-78, 3:88-90). Those rulings were based on the nature of the evidence, not the date of the classification events (although the dates at issue were discussed).

After the jury had begun deliberating, they submitted a written question to the Court asking: "What period of time does the ADA claim cover?" (Tr. 7:125). Counsel for plaintiff stated that the claim began with Cox's incarceration in 2007; counsel for defendant stated that

the claim began in 2010. (Tr. 7:125-26). The parties and the Court then had the following

exchange:

> MS. BRIGGS: Your Honor, I'd also like to bring up sort of a statute of limitations argument. I don't think that this case goes back to 2007. It was filed in 2013. There's a three-year statute of limitations on ADA claims. That would, again, bring us to 2010 . . . .

> THE COURT: Although that hasn't been raised as a factual matter at the trial, right? In other words, there's no request for a statute of limitations instruction. It's an affirmative defense. It has to be—

> MS. MELVILLE: Well, that's because, your Honor, the evidence that all went in was 2010 forward. That's when the complaint began for the time period, and the Court at sidebar at one point did point out to plaintiffs that everything begins with Old Colony, when we did bring that to the Court's attention at sidebar during plaintiff's case.

> THE COURT: Well, that was certainly my understanding, at least at the time.

> MS. MELVILLE: That's why there's no statute of limitations. That was our understanding.

> THE COURT: Ms. Codagnone.

> MS. CODAGNONE: Your Honor, in the plaintiff's trial brief and all the filings up and until that point, when we were trying to explain to the parties what our position was, it was every day of his incarceration he's been without these services. They haven't provided a reasonable accommodation in 2007 when Kimberly O'Brien notified the DOC that he could not read or write and he needed someone to help him with letters, when they referred him to the RTU in 2007, they did not make that accommodation. That's all within the medical records. . . . As to the statute of limitations, that's something that was never argued as an affirmative defense, never raised up and until this point. The jury has the case. I think that's a little bit late.

(Tr. 7:127-28).

Counsel for Cox requested that the Court instruct the jury to "find what the evidence

shows, and when the elements [of an ADA claim] are met, that's when the claim begins, and of

course, it can't extend beyond or prior to his incarceration within the Department of

Correction . . . which begins in 2007." (Tr. 7:129). The DOC responded that "that would plainly

39

prejudice the defendants, who have never prepared to defend 2007 to 2010. The period of time—the evidence went in on the period of time 2007 sort of towards notice in the record but certainly not as a claim in the case." (*Id.*).

The Court consulted Cox's trial brief, which stated that he had been denied access to prison programs and services "[t]hroughout his incarceration." (Tr. 7:132). The Court also consulted the complaint, which stated that "Plaintiff is a qualified individual with a disability as defined in the ADA. Since 2007, plaintiff has been held in the custody of the defendants." (Tr. 7:138). The Court concluded that "the combination of the complaint and the pretrial brief, I guess, are enough to have put the defendants on notice that the complaint as to the ADA was not limited to the three-year limitation period, and so that's going to be my ruling." (*Id.*). The Court then answered the jury's question as follows:

> The time period begins no earlier than 2007 because he wasn't incarcerated at that point—that is, the plaintiff wasn't incarcerated—and it begins as to each specific disputed issue under the ADA at the point where the requirements for the ADA are satisfied. In other words, the point at which according to the evidence the . . . plaintiff had a qualifying disability, that he was denied meaningful access to the particular service, program, or activity, and that he either had made a request for a reasonable modification or reasonable accommodation or that request was obvious and that it had been denied, and it may be different for each particular item, [or] it may all be the same, it depends on what the evidence shows that point at which all of those factors have been satisfied.

(Tr. 7:139).

The record does not support a finding of unfair surprise. Throughout the course of this litigation, Cox's pleadings have made clear his position that his claims extend back to the beginning of his incarceration in 2007. For example, the complaint includes numerous references to events that occurred between 2007 and 2010, and, with respect to the ADA claim in particular, it states that Cox is a "qualified individual with disabilities"; that "*[s]ince 2007*, [he] has been held in the custody of Defendants"; and that the DOC "fail[ed] to provide him with

40

reasonable accommodation." (Compl. ¶¶ 66, 68) (emphasis added). Similarly, Cox's opposition to defendants' motion for summary judgment begins by stating that "Plaintiff Cox, an inmate with severe mental illness, who is unable to read, write, dial a telephone or to remember how to change his own clothes, filed this suit because *throughout his incarceration* the Defendants have failed to protect him." (Pl. Opp. to Def. Mot. for Summ. J. at 1) (emphasis added). Cox's trial brief similarly stated that "*[t]hroughout his incarceration*, he has been unable to contact his counsel, his family, participate in the classification or appeals processes, fill out a sick slip, or even order food from canteen without asking another inmate for assistance." (Pl. Tr. Br. at 2). While perhaps not the most precise statements of the scope of his claim, those statements certainly should have put defendants on notice that his claim extended beyond 2010. Under these circumstances, it cannot be said that Cox's position that his claim extended back to 2007 was a "completely new issue." *See Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 287 (1st Cir. 1993) (stating that finding of reversible error from unfair surprise is generally limited to "situations where a completely new issue is suddenly raised or a previously unidentified expert witness is suddenly called to testify" (quoting *Conway v. Chemical Leaman Tank Lines, Inc.*, 687 F.2d 108, 111-12 (5th Cir. 1982)).

Furthermore, although defendants pleaded the statute of limitations as an affirmative defense, they did not assert that issue at trial, and the question was not put to the jury. Under the circumstances, the Court will not grant a new trial on the issue of unfair surprise.

## III.    Conclusion

For the foregoing reasons,

1.    The motion of defendant Massachusetts Department of Correction for judgment as a matter of law under Fed. R. Civ. P. 50 is GRANTED in part as to plaintiff's

claim under the American with Disabilities Act concerning his access to the use of telephones, and is otherwise DENIED.

2. The motion of defendant Massachusetts Department of Correction for remittitur pursuant to Fed. R. Civ. P. 59(e) and for a new trial pursuant to Fed. R. Civ. P. 59(a) is GRANTED in part as to plaintiff's claim under the American with Disabilities Act concerning his access to procedures to report and resolve grievances. The Court will order a new trial limited solely to the issue of damages for plaintiff's access to procedures to report and resolve grievances unless plaintiff accepts a remittitur of $1,000 within 30 days of this order. The motion is otherwise DENIED.

**So Ordered.**


/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  March 31, 2018                     United States District Judge